OPINION OF THE COURT
Kathryn E. Freed, J.
In this CPLR article 78 proceeding, petitioner, Robert Carniol (Carniol) moves, via order to show cause, for: (1) a declaration that the use of Global Positioning System (GPS)[1] technology to track taxi drivers is a search under New York law; (2) a declaration that a search using this GPS system violates article I, § 12 *201 of the New York Constitution;[2] (3) an order barring the New York City Taxi and Limousine Commission (TLC) from using the fruits of GPS searches to prosecute individual taxi drivers; (4) an order that respondents, TLC, David Yassky (Yassky or the Chairperson) and the City of New York (City) (collectively the city respondents), restore Carniol’s taxi driver’s license; (5) damages, including punitive damages; and (6) certification of this action as a class action.
The city respondents cross-move, pursuant to CPLR 3211 (a) (2) and (7), to dismiss the amended petition.
Factual Background
The amended petition states that in 2007, the TLC mandated that all New York City medallion cabs be equipped with a Taxi Technology System (TTS) which includes, inter alia, a GPS, text messaging capabilities and a monitor displaying certain rate and fare information for the passenger (amended petition ¶ 9). TLC Rules (35 RCNY) § 3-06 (b) states that the TTS must be capable of transmitting to the TLC “at pre-determined intervals established by the Chairperson”: “[T]he taxicab license number; the taxicab driver’s license number; the location of trip initiation; the time of trip initiation; the number of passengers; the location of trip termination; the time of trip termination; the metered fare for the trip; and the distance of the trip.” (Amended petition ¶ 14.)
Before the rules regarding TTS took effect, a group of drivers and the New York Taxi Workers Alliance filed a federal lawsuit challenging the rules (Alexandre v New York City Taxi & Limousine Commn., 2007 WL 2826952, 2007 US Dist LEXIS 73642 [SD NY, Sept. 28, 2007, No. 07-Civ-8175 (RMB)]). The Alexandre plaintiffs advanced federal privacy claims which the Federal District Court rejected, finding that GPS tracking, as it was configured under TTS, was not a “search or seizure within the ambit of the Fourth Amendment” (2007 WL 2826952, *9, 2007 US Dist LEXIS 73642, *32 [internal quotation marks and citation omitted]) (amended petition ¶ 21). According to the TLC, the purported benefits of TTS include: (1) the collection of a body of information for the TLC’s regulatory analysis, including analysis of pick-up points, drop-off points, trip time and distance and passenger counts; (2) assistance in locating a passenger’s lost property; (3) eliminating the requirement that drivers complete handwritten trip sheets; and (4) permitting a pas *202 senger to pay by credit card (amended petition ¶ 22). The TLC never stated that it would use the information it gathered to track drivers for investigatory purposes (amended petition ¶¶ 23, 26).
Thereafter, in 2008 or 2009, the TLC received complaints from passengers regarding alleged overcharges by a certain taxi driver. The complaints alleged that the taxi driver had charged the higher out of town rate (Rate 4) for trips that were entirely within New York City (Rate 1). Following the investigation of the TTS generated records for this particular taxi driver, the TLC expanded its review of the computer records generated by the TTS system to include substantially all of the City’s 42,000 cab drivers (amended petition ¶¶ 29-43).
In May 2010, the TLC issued a press release stating that, based on its review of the records, more than 21,000 taxi drivers had overcharged passengers, using Rate 4 rather than Rate 1, for more than $1 million. Among the drivers who allegedly engaged in the overcharging was petitioner Carniol who had, according to the TLC, overcharged passengers 91 times (amended petition ¶ 61).
By letter dated May 13, 2010, the TLC directed Carniol to appear for a settlement conference “in reference to allegations that, . . . you deliberately and intentionally overcharged passengers on 91 separate occasions by illegally using Rate 4 code. Our records indicate that you overcharged passengers approximately $358.80 during this time period” (amended petition, exhibit 13). The letter stated that the purpose of the conference was to see whether the matter could be resolved without “proceeding with a discretionary revocation hearing before The Office of Administrative Trials and Hearings (OATH)” (id.). Carniol rejected the TLC’s settlement offers and insisted on a trial.
By letter dated February 11, 2011, the TLC notified Carniol that it had commenced a proceeding against him which “seeks to revoke your TLC license. In addition or in lieu thereof, your TLC license may be suspended or substantial fines may be imposed against you” (amended petition, exhibit 16). The petition charges Carniol with 90 counts of violating section 2-34 (a) of the Taxicab Drivers Rules (35 RCNY), “[i]n that between April 12, 2009 and February 27, 2010, . . . (Carniol) deliberately and intentionally overcharged passengers ... by illegally using the Rate 4 code.” Five of the alleged violations were specifically listed in the petition. The petition also states that “TLC seeks *203 the revocation of (Carniol’s) license and the maximum fine for these rule violations pursuant to 35 RCNY 8-03 (b) (ii) and 2-87” {id.).
Following the trial, the Administrative Law Judge (ALJ) issued a report and recommendation finding that the TLC proved the charge against Carniol and, pursuant to 35 RCNY 8-03 (b) (ii) and 2-87, recommended revocation of respondent’s license and the imposition of an $850 fine. In that report and recommendation, the ALJ specifically found that: (1) Carniol received adequate notice of the charges; (2) the TLC lawfully obtained evidence against the respondent in that the TLC properly search the automated records that it lawfully possessed; (3) Carniol had no reasonable expectation of privacy in the trip information gathered by TLC; and (4) that the printout listing 90 Rate 4 violations was admissible (amended petition, exhibit 18).
On August 15, 2011, the Chairperson accepted the ALJ’s report and recommendation and revoked Carniol’s taxi driver’s license and imposed an $850 fine against him (amended petition, exhibit 19).
Positions of the Parties
Carniol argues that the revocation of his taxi driver’s license should be invalidated in that OATH had no jurisdiction over this action because section 2303 (a) of the New York City Charter mandates that violations of the Administrative Code and rules pertaining to the TLC shall be adjudicated by the TLC’s own tribunal; that the exception to section 2303 (a) which states that OATH shall conduct hearings when the Commission seeks discretionary, rather than mandatory, license revocation (Administrative Code of City of NY § 19-506) is inapplicable; TLC’s tracking of Carniol was a warrantless search in violation of his rights under article I, § 12 of the State Constitution and the Fourth Amendment of the Federal Constitution; the TLC cannot invoke the administrative search exception to the warrant requirement and; the TLC’s TTS has not been shown to be sufficiently reliable for its data to be admissible in court. Carniol also takes the position that because his license revocation was mandatory, not discretionary, he had no right to appeal the Chairperson’s final order.
In opposition to the relief demanded in the amended petition, and in support of their cross motion to dismiss, the city respondents contend this court lacks jurisdiction to entertain this petition because Carniol failed to exhaust his administrative remedies. It is the city respondents’ position that Carniol’s *204 taxi license revocation was discretionary and that he had the right to appeal the Chairperson’s final order to the full Commission, which he failed to do, and now his time to do so has expired.
In addition, the city respondents argue that the use of the GPS data does not violate Carniol’s privacy rights under the State or Federal Constitutions; that the revocation was based on admissible evidence; that the hearing was properly before OATH; and that the collection of the TTS data was duly authorized.
Conclusions of Law
Under TLC Rules (35 RCNY) § 2-87 (a) (1), the TLC “shall” fine, and it may exercise its discretion to revoke a taxicab driver’s license, if the driver is found guilty of violating TLC Rules (35 RCNY) § 2-34 (a) once or twice within 24 months. However, a taxicab driver’s license shall be revoked, as a mandatory revocation, if the driver is found guilty of violating TLC Rules (35 RCNY) § 2-34 (a) three times within a 36-month period.
TLC Rules (35 RCNY) § 2-87 (a) (1) states in pertinent part:
“Any driver who has been found to have violated a provision of §§ 2-34 (a), . . . , shall be fined not less than $200.00 nor more than $350.00. Any driver who has been found in violation of any of the provisions of such rules . . . , for a second time within a twenty-four month period, shall be fined not less than $350.00 nor more than $500.00, and the Commission may suspend the driver’s license of such driver for a period not to exceed thirty days. The Commission shall revoke the driver’s license of any driver who has been found to have violated any of the provisions of §§ 2-34 (a) . . ., three times within a thirty-six month period.
“Nothing contained herein shall limit or restrict any other authority the Commission may have to suspend or revoke a driver’s license.”
TLC Rules (35 RCNY) § 8-03 (b) (ii) states, in pertinent part, that “the Commission may, in its discretion, impose a penalty of license revocation . . . and/or a fine: . . . not to exceed $1,000 for each violation” of the rules.
TLC Rules (35 RCNY) § 68-18, entitled “Appeal of Chairperson’s Final Decision” states, in part:
“(a) The only Chairperson’s Final Decision that can be appealed is a decision regarding the imposition of *205 Discretionary Revocation (see § 68-19).
“(b) The Chairperson’s Final Decision on the imposition of discretionary revocation can be appealed to the Commissioners following these rules:
“(1) The Respondent must file a written appeal with the Deputy Commissioner for Legal Affairs/General Counsel within 30 calendar days from the date of the Chairperson’s final decision.”
Pursuant to TLC Rules (35 RCNY) § 68-19 (b) (2), if the Commission seeks a discretionary revocation, the proceeding must be commenced before OATH.
“It is hornbook law that one who objects to the act of an administrative agency must exhaust available administrative remedies before being permitted to litigate in a court of law” (Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 57 [1978]; Matter of Uddin v New York City Taxi & Limousine Commn., 106 AD3d 557, 557 [1st Dept 2013]; Matter of Contest Promotions-NY LLC v New York City Dept. of Bldgs., 93 AD3d 436, 437 [1st Dept 2012]). “The exhaustion rule, however, is not an inflexible one. It is subject to important qualifications. It need not be followed, . . . when an agency’s action is challenged as either unconstitutional or wholly beyond its grant of power” (Watergate II Apts. at 57; see also Matter of Contest Promotions-NY LLC at 437).
In this case, the city respondents correctly argue that Carniol’s revocation was identified as a discretionary revocation from the initiation of the charges against him. The May 13, 2010 letter directing Carniol to appear for a settlement conference expressly states that in the absence of settlement, the Commission would proceed with a “discretionary revocation matter” (amended petition, exhibit 13). Additionally, the OATH petition listing the charges specifically stated that the TLC was seeking revocation and a fine pursuant to TLC Rules §§ 8-03 (b) (ii) and 2-87 and those rules were cited in the ALJ’s report and recommendation as the basis for the revocation and fine (amended petition, exhibits 16, 18). Both of those rules permit discretionary revocation under the circumstances here.
Moreover, it is undisputed that the TLC had not charged Carniol with any previous violations of any of the rules cited in TLC Rules § 2-87 — this was his first offense. Accordingly, pursuant to the clear language of that rule and the discretion afforded the Commission under TLC Rules § 8-03 (b) (ii), the *206 Chairperson exercised his discretionary power to revoke Carniol’s taxi driver’s license.
Therefore, pursuant to TLC Rules § 68-18, Carniol should have appealed the Chairperson’s August 15, 2011 final decision to the full Commission within 30 days of the date of the Chairperson’s final decision. This he did not do and Carniol’s failure to exhaust his administrative remedies precludes judicial review of his nonconstitutional claims Watergate II Apts. at 57-58; Matter of Contest Promotions-NY LLC at 437).
As to the constitutional claim, this court will exercise its discretion to consider whether Carniol’s state and/or federal privacy rights were violated by the respondents.
Federal Fourth Amendment Claim
“Government regulations that mandate searches or seizures are subject to the Fourth Amendment’s strictures”[3] (Buliga v New York City Taxi Limousine Commn., 2007 WL 4547738, *2, 2007 US Dist LEXIS 94024, *5 [SD NY, Dec. 21, 2007, No. 07-Civ-6507 (DLC)], affd 324 Fed Appx 82 [2d Cir 2009]). However, petitioner may not prevail on his Fourth Amendment claim unless he can show that the search and seizure by the State infringed on his legitimate expectation of privacy (id.). “[I]n order to claim the protection of the Fourth Amendment, a [petitioner] must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . . .” (Minnesota v Carter, 525 US 83, 88 [1998].)
It has long been recognized that the TLC is vested with a broad grant of authority to promulgate and implement a regulatory program for the taxicab industry (Matter of New York City Comm, for Taxi Safety v New York City Taxi & Limousine Commn., 256 AD2d 136, 137 [1st Dept 1998]). The 2004 amendment to the TLC’s rules and regulations which requires the installation of equipment that would, inter alia, electronically transmit vehicle and trip information, “specifically requires the transmission of the taxicab’s and driver’s license numbers, the number of passengers, the starting and ending times and locations of the trip, the metered fare for the trip, and the trip distance” (Buliga, 2007 WL 4547738, *1, 2007 US Dist LEXIS 94024, *2; Alexandre v New York City Taxi & Limousine Commn., 2007 WL 2826952, 2007 US Dist LEXIS 73642 [SD *207 NY 2007]). Individuals who engage in work in a closely regulated industry “have reason to expect intrusions upon their privacy insofar as it pertains to their work” (Buliga, 2007 WL 4547738, *2, 2007 US Dist LEXIS 94024, *8 [internal quotation marks omitted], citing Vernonia School Dist. 47J v Acton, 515 US 646, 657 [1995]; see also Statharos v New York City Taxi & Limousine Commn., 198 F3d 317, 325 [2d Cir 1999]). Here, the TTS system was installed with the knowledge of the taxicab owners and all taxicab drivers are required to follow TLC regulations which mandate the use of the TTS system (see Alexandre, 2007 WL 2826952, *4, 2007 US Dist LEXIS 73642, *14-17). “Adults who choose to participate in a heavily regulated industry, such as the taxicab industry, have a diminished expectation of privacy, particularly in information related to the goals of the industry regulation” (Buliga, 2007 WL 4547738, *2, 2007 US Dist LEXIS 94024, *8).
However, even if petitioner could show that he has a legitimate expectation of privacy in trip data gathered by the GPS device, which he cannot, his Fourth Amendment claim of privacy would be outweighed by the legitimate governmental interests articulated by the TLC (Alexandre, 2007 WL 2826952, *10, 2007 US Dist LEXIS 73642, *33-35; United States v Miller, 430 F3d 93, 97 [2d Cir 2005] [“(t)he touchstone of the Fourth Amendment is reasonableness”]). “Even in the context of a search authorized by statute or regulation, the reasonableness of a search or seizure is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests” (Buliga, 2007 WL 4547738, *3, 2007 US Dist LEXIS 94024, *8-9, citing Skinner v Railway Labor Executives’ Assn., 489 US 602, 619 [1989] [internal quotation marks omitted]). The balancing test to be applied where, as here, the petitioner complains of a warrantless search in violation of his privacy rights is: “(1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government’s needs” (United States v Amerson, 483 F3d 73, 83-84 [2d Cir 2007]).
In this case, Carniol’s privacy interest in the trip data generated by the GPS device is minimal and the government’s intrusion is also minimal. “[I]t does not involve a physical intrusion into [Carniol]’s body or home” (Buliga, 2007 WL 4547738, *3, 2007 US Dist LEXIS 94024, *11 [internal quotation marks omitted]) and it does not collect data regarding Carniol’s where *208 abouts when he is off duty. On the other hand, the government interest in improving taxi customer service and TLC’s ability to regulate it by using modern methods to promote passenger and driver safety, is substantial.
Petitioner’s reliance on the recent Supreme Court decision in United States v Jones (565 US —, 132 S Ct 945 [2012]), for the proposition that the collection of the GPS data without a warrant constitutes an illegal search, is without merit. The sole issue decided in Jones was whether the surreptitious attachment of a GPS tracking device to a vehicle and its subsequent use to monitor the vehicle on a public road and record information about an individual’s personal life constitutes a search and seizure. In that case, the Court merely determined that such GPS monitoring was a search but it did not address whether the search was reasonable.
Indeed, the circumstances here are readily distinguishable. In the case before the court, the GPS monitoring occurred with the knowledge of the taxi driver and it was narrowly tailored to achieve a regulatory goal. The GPS system was installed with the taxi owner’s consent for the purpose of gathering information when a taxi driver is on duty about the location of trips and rates charged. The TTS and GPS do not record information about the driver’s personal life. And, as the court determined in Buliga, the search here would be deemed reasonable even if Carniol did have a privacy interest in the GPS data because his interest was minimal, the intrusion was minimal and outweighed by the legitimate governmental interests to regulate and improve the taxi industry and the safety and convenience of the driver and the passengers.
The State Constitutional Claim
Petitioner has not demonstrated that he has a legitimate expectation of privacy in the collection or transmission of the GPS trip data under article I, § 12 of the State Constitution. The location information collected by the TLC is related solely to the petitioner’s employment as a taxicab driver and it is mandated by TLC rules. The information that was collected in this case pertained only to petitioner’s whereabouts while on duty.
Petitioner’s reliance on People v Weaver (12 NY3d 433, 441 [2009]) and Matter of Cunningham v New York State Dept. of Labor (21 NY3d 515 [2013]) for the proposition that the search violated Carniol’s privacy rights under the State Constitution is unavailing. The instant matter does not involve the surrepti *209 tious placement of a GPS device on a vehicle and it does not involve tracking that vehicle while the driver took trips of a private nature (see People v Weaver, 12 NY3d 433, 441 [2009] [24-hour tracking for 65 days]) or secret tracking of a personal vehicle during nonworking hours (Cunningham v New York State Dept. of Labor, 21 NY3d 515 [2013] [24-hour-a-day tracking for a month]). Moreover, the search does not involve the physical intrusion into the petitioner’s body or home (Buliga, 2007 WL 4547738, *3, 2007 US Dist LEXIS 94024, *11).
Here, the TTS equipment placed in each New York City taxicab electronically tracks location, trip and fare information only while the driver is on duty. The purpose of the GPS is to gather information pertaining to the taxicab business. It is not designed or used to collect personal information about the driver. The data the TLC collected are business records which the agency had the right to inspect without a warrant (Matter of Glenwood TV v Ratner, 103 AD2d 322, 328 [2d Dept 1984], affd 65 NY2d 642 [1985] [“modern businessman has little or no expectation of privacy in his business records, especially those documents prepared in compliance with regulatory requirements” (internal quotation marks and citation omitted)]).
Thus, under the State Constitution, Carniol had no legitimate expectation of privacy in the records generated by the TTS system (People v Abdelmalak, Sup Ct, NY County, 2010, index No. 4197/10; People v Bah, Sup Ct, NY County, 2010, index No. 4187/10) (these unreported cases are attached to city respondents’ memorandum of law, appendix) but, even assuming arguendo that he did have a privacy right, that right was outweighed by legitimate governmental interests.
In Matter of Caruso v Ward (72 NY2d 432, 437 [1988]), the Court employed a reasonableness standard, similar to the standard articulated by the federal court in Buliga. In Caruso, the Court noted that “random searches conducted by the State without reasonable suspicion are closely scrutinized, and generally only permitted when the privacy interests implicated are minimal, the government’s interest is substantial, and safeguards are provided to insure that the individual’s reasonable expectation of privacy is not subjected to unregulated discretion” (Caruso at 438, citing Matter of Patchogue-Medford Congress of Teachers v Board of Educ. of Patchogue- Medford Union Free School Dist., 70 NY2d 57, 70 [1987]).
Pursuant to the three-part test cited in Caruso, a warrantless search was justified in this case because: (1) Carniol had a *210 diminished privacy interest in the GPS data (see Matter of Murtaugh v New York State Dept. of Envtl. Conservation, 42 AD3d 986, 989 [4th Dept 2007] [those engaged in a heavily regulated industry have a diminished expectation of privacy]; see also Matter of Ford v New York State Racing & Wagering Bd., 107 AD3d 1071, 1076 [3d Dept 2013]; New York Coalition of Recycling Enters. v City of New York, 158 Misc 2d 1, 16 [Sup Ct, NY County 1992] [“There is little or no expectation of privacy in business records in such an extensively regulated industry, especially for documents prepared in compliance with regulatory requirements”]); (2) the government’s interest in insuring the safety of both driver and passenger and in generating information to improve service to passengers is both legitimate and substantial (see e.g. Ford at 1076); and (3) safeguards are in place to insure that information is only gathered while the taxi driver is on duty and that the information collected pertains only to the taxi industry.
Here, petitioner has failed to demonstrate that he had a legitimate expectation of privacy in the information obtained as a result of the use of the GPS technology and/or that the information was collected in derogation of his privacy rights under the State or Federal Constitutions.
Therefore, in accordance with the foregoing, it is hereby ordered that petitioner Robert Carniol’s motion for: (1) a declaration that the use of GPS technology to track taxi drivers is a search under New York law; (2) a declaration that a search using this GPS system violates the New York Constitution; (3) an order barring the New York City Taxi and Limousine Commission from using the fruits of GPS searches to prosecute individual taxi drivers; (4) an order that the respondents, TLC, David Yassky and the City of New York restore Carniol’s taxi driver’s license; (5) damages, including punitive damages; and (6) certification of this action as a class action, is denied in its entirety; and it is further ordered that respondents New York City Taxi and Limousine Commission, David Yassky and City of New York’s cross motion to dismiss the petition is granted and the proceeding is dismissed.

. GPS is a satellite based navigation system that has precise tracking capability (see People v Weaver, 12 NY3d 433, 441 [2009]).

. Petitioner has also preserved his Federal, Fourth Amendment claims.

. In Buliga, the TLC did not dispute that its collection of GPS data was a search and seizure by the government.