**Hassan EL–NAHAL, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**David YASSKY, et al., Defendants.**

**No. 13 Civ. 3690(KBF).**

United States District Court, S.D. New York.

Jan. 29, 2014.

---

Daniel Lee Ackman, Daniel L. Ackman, Esq., New York, NY, for Plaintiff.

Sherrill M. Kurland, New York City Law Department, New York, NY, for Defendants.

## MEMORANDUM DECISION & ORDER

KATHERINE B. FORREST, District Judge:

On May 31, 2013, plaintiff Hassan El-Nahal filed a complaint against defendants David Yassky, Commissioner Matthew Daus, Michael Bloomberg, and the City of New York alleging that the New York City Taxi and Limousine Commission (TLC) has violated 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution, as well as Article I, § 12 of the New York State Constitution, by using a global positioning system (GPS) device to track plaintiff's whereabouts without probable cause or a search warrant. (Complaint ¶¶ 113–120, ECF No 1.) On August

21 and September 24, 2013, the parties filed cross-motions for summary judgment. (ECF Nos. 11, 17.) For the following reasons, defendants' motion is GRANTED and plaintiff's motion is DENIED.

## I. BACKGROUND

### A. Factual Background

The following facts are undisputed, unless indicated otherwise. The Court recites only those facts relevant to its decision.

The New York City Taxi and Limousine Commission (TLC) is the agency charged with regulating and supervising the transportation of persons by licensed vehicles for hire in New York City. (Defs.' Statement Pursuant to Rule 56.1 ("Defs.' 56.1") ¶ 1, ECF No. 33.) The TLC's responsibilities include regulating taxicab safety, design and comfort; reasonable rates of fare for taxi service; and the licensing of taxi drivers. (Defs.' 56.1 ¶¶ 25.) The TLC has the right to inspect books and records and to require the submission of any reports that it deems necessary. (Defs.' 56.1 ¶ 6.)

Since 1992, the TLC rules have required a TLC-licensed New York City taxi driver to create and maintain a trip record. (Defs.' 56.1 ¶ 7.) Until recently, drivers were required to keep a trip record in which they entered certain information, including: (1) at the start of each trip, the date, time, specific location, and number of passengers; (2) on completion of the trip,

the destination, time, amount of fare, and any tolls paid; (3) the taxi's readings at the end of the shift; and (4) any toll bridges or tunnels used by the driver, whether or not with a passenger. (Defs.' 56.1 ¶ 8.)

The TLC currently mandates that all New York City taxis must be equipped with a Taxicab Technology System ("T–PEP" or "TTS" system), which includes a GPS, a credit-card device, and monitors for the driver and passengers, and which automatically collects certain trip information, including the taxi license number, the taxi driver's license number, the location of trip initiation, the time of trip initiation, the number of passengers, the location of trip termination, the time of trip termination, the metered fare for the trip, and the distance of the trip. (Ackman Decl. Ex. 2, at § 3–06(b), ECF No. 18; Pl.'s Rule 56.1 Statement in Supp. of His Mot. for Summ. J. ("Pl.'s 56.1") ¶¶ 3, 5, ECF No. 20; Defs.' 56.1 ¶ 9.) [1] Taxi drivers are required to create handwritten trip records if the T–PEP system fails to operate properly. (Defs.' 56.1 ¶ 10.)

Taxis are also equipped with a meter that displays the fare, surcharges, and the rate codes. (Defs.' 56.1 ¶ 11.) There are six rate codes, including trips within the city, trips to and from airports, trips beyond the city limits and to other counties, negotiated fares, and group rides. (*Id.*) At the start of each trip, the driver sets the

---

**1.** Plaintiff claims that "the TLC requires that all taxis and taxi drivers *continuously* transmit their locations *at all times* to the TLC or its agents by use of GPS." (Mem. of L. in Supp. of Pl.'s Cross Mot. for Partial Summ. J. and in Opp. to Defs.' Mot. to Dismiss ("Pl.'s Mot.") 3, ECF No. 22; Pl.'s 56.1 ¶ 6.) That is a leap from the facts. Rather, TLC Rule 3–06 states: "Each taxicab shall be capable of transmitting data to the Commission ... at *pre-determined intervals* established by the Chairperson." (Ackman Decl. Ex. 2, at § 3– 06(b) (emphasis added); *see also* Defs.' Resp. to Pl.'s Statement of Material Facts ("Defs.' Resp.") ¶¶ 56, ECF No. 28.) Additionally, the system only transmits data when the driver is on duty. (*See* Ackman Decl. Ex. 2, at § 3– 06(b).) *See Carniol v. New York City Taxi & Limousine Comm'n*, 42 Misc.3d 199, 975 N.Y.S.2d 842, 850 (N.Y.Sup.Ct.2013) (explaining that "the TTS equipment placed in each New York City taxicab electronically tracks location, trip and fare information only while the drive[r] is on duty").

rate by pushing a button on the meter. (Defs.' 56.1 ¶ 11.)

Among other requirements, taxi drivers are prohibited from charging a fare above the approved rates. (Defs.' 56.1 ¶ 13.) Penalties apply to various violations of the rules, including overcharging. (Defs.' 56.1 ¶ 14.) When a taxi driver is charged with a violation of any TLC rule, the TLC may, in its discretion, impose a penalty of license revocation, license suspension of up to six months, and/or a fine. (Defs.' 56.1 ¶¶ 15–16.)

In 2007, before the taxi technology rules took effect, plaintiffs filed two lawsuits challenging the new rules and seeking to enjoin them from taking effect. (Pl.'s 56.1 ¶¶ 9, 13.) In both cases, the district courts rejected the drivers' claims on the basis that no search had occurred for purposes of the Fourth Amendment, because drivers had no legitimate expectation of privacy in any of the information that would be collected under the TLC T–PEP rules. (Pl.'s 56.1 ¶¶ 11, 13 (citing *Buliga v. New York City Taxi & Limousine Comm'n*, No. 07 Civ. 6507(DLC), 2007 WL 4547738 (S.D.N.Y. Dec. 21, 2007), *aff'd*, 324 Fed. Appx. 82 (2d Cir.2009) (summary order); *Alexandre v. New York City Taxi & Limousine Comm'n*, No. 07 Civ. 8175(RMB), 2007 WL 2826952 (S.D.N.Y. Sept. 28, 2007)).)

Also in 2007, before the technology mandate took effect, the TLC issued a "Statement of Basis and Purpose," which stated the reasons for its technology and GPS mandate. (Pl.'s 56.1 ¶ 16.) The TLC made no mention in this statement (or elsewhere) of using GPS data to investigate or prosecute taxi drivers. (Pl.'s 56.1 ¶ 17.) On its website, the TLC stated that it would use the T–PEP technology to provide customer service improvements, and that it was "replacing the current hand-written trip sheets with automatic electronic trip sheets which are limited to collecting pick-up, drop-off, and fare information, all of which are already required." (Pl.'s 56.1 ¶ 17.)

On March 12, 2010, the TLC issued an e-mail press release in which it claimed that 35,558 taxi drivers had illegally overcharged at least one passenger over a 26–month period by manually switching the taxi meter from Rate Code 1 (the default setting used for trips within the city) to Rate Code 4 (the rate that applies to out-of-city trips). (Pl.'s 56.1 ¶ 19.) The TLC stated that it used "GPS technology installed in taxicabs" to make this discovery. (*Id.*) On March 14, 2010, the TLC issued a revised press release that stated that 21,-819 drivers had overcharged passengers. (Pl.'s 56.1 ¶ 24.)

On or around January 3, 2012, the TLC sent a letter to plaintiff instructing him to appear at a hearing concerning overcharges. (Pl.'s 56.1 ¶ 36.) Plaintiff was found guilty after a hearing, and the ALJ imposed fines totaling $550 and revoked his license. (Pl.'s 56.1 ¶ 46.) The OATH Taxi and Limousine Tribunal appeals board reversed that ruling and reinstated plaintiffs license. (Pl.'s 56.1 ¶¶ 47–48.) On remand, the TLC reinstituted some charges against plaintiff. (Pl.'s 56.1 ¶ 52.) Plaintiff was again found in violation and his license was again revoked. (Pl.'s 56.1 ¶ 53.) On appeal, the appeals tribunal again reversed. (Pl.'s 56.1 ¶ 54.) Finally, plaintiff was found guilty for a third time, he again appealed, his conviction was again reversed, and his license was again restored. (Pl.'s 56.1 ¶¶ 55–57.)

Plaintiff claims, "To this day, with possibly one or two exceptions, the TLC has not produced any claim by any actual passenger that he or she was overcharged." (Pl.'s Mot. 9; Pl.'s 56.1 ¶ 31.)

### B. *Procedural History*

Plaintiff filed his complaint on May 31, 2013. (ECF No. 1.) On August 21, 2013, defendants moved to dismiss the complaint for failure to state a claim. (ECF No. 9.) On September 13, 2013, the Court deemed that motion a motion for summary judgment. (ECF No. 16.) That motion became fully briefed on December 6, 2013. (ECF No. 36.) On September 24, 2013, plaintiff filed a cross-motion for summary judgment. (ECF No. 22.) That motion became fully briefed on November 15, 2013. (ECF No. 34.)

## II. *STANDARD OF REVIEW*

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir.2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. *Price v. Cushman & Wakefield, Inc.,* 808 F.Supp.2d 670, 685 (S.D.N.Y.2011); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citations omitted); *see also Price,* 808 F.Supp.2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the nonmoving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—*i.e.,* "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record ... that no reasonable jury could believe it." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *see also Zellner v. Summerlin,* 494 F.3d 344, 371 (2d Cir.2007) ("Incontrovertible evidence relied on by the moving party ... should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

## III. *DISCUSSION*

Plaintiff alleges a violation of the Fourth Amendment of the United States Constitution and Article I, § 12 of the New York Constitution by virtue of defendants' use of GPS devices in regard to taxi service.

(*See* Compl. ¶¶ 113–120.) However, plaintiff directs much of his complaint and many of his arguments not to the *collection* of data through the T–PEP system but to the *use* of the data in administrative proceedings. (*See, e.g.,* Compl. ¶¶ 25–34.) Those arguments ultimately prove irrelevant to the federal constitutional claim-the only federal claim—presented by plaintiff's complaint. (*See* Compl. ¶¶ 113–126.) Regardless of how defendants used the T–PEP data, they did not conduct a search in collecting that data; and if, *arguendo,* defendants did conduct a search, that search was reasonable. Plaintiffs federal constitutional claims therefore fail as a matter of law.

### A. *Plaintiff's Fourth Amendment Claim*

The use of T–PEP data in an administrative proceeding does not constitute a search within the meaning of the Fourth Amendment. Even assuming that the use of such data was a search, any such search was reasonable and thus did not constitute a violation of the Fourth Amendment. As a result, plaintiffs Fourth Amendment claim fails as a matter of law.

#### 1. *Legal Standard for a Search*

a. *"Reasonable Expectation of Privacy"*

A search within the meaning of the Fourth Amendment of the U.S. Constitution "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Maryland v. Macon,* 472 U.S. 463, 469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (internal quotation marks omitted). This inquiry "embraces two discrete questions. The first is whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy—whether ... the individual has shown that he seeks to preserve [something] as private. The second question is whether the individual's subjective expec-

tation of privacy is one that society is prepared to recognize as reasonable...." *United States v. Knotts,* 460 U.S. 276, 280–81, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (alteration in original) (citations and internal quotation marks omitted).

 Here, as the Second Circuit has already ruled, plaintiff had no reasonable expectation of privacy in the T–PEP data at issue. *See Buliga,* 324 Fed.Appx. 82. Local law requires the collection of the data. (Defs.' 56.1 ¶ 9.) Prior to the installation of the T–PEP system, drivers were required to create "trip sheets" containing the same information. (Defs.' 56.1 ¶¶ 7–8.) Furthermore, "[t]axicabs in New York City have long been subject to regulation by the TLC," *Buliga,* 2007 WL 4547738, at *2, and the TLC maintains the right to inspect books and records, including the trip sheets (Defs.' 56.1 ¶ 6). Accordingly, plaintiffs cannot show a reasonable expectation of privacy in any of the information collected under the system. *See Buliga,* 2007 WL 4547738, at *2; *Alexandre,* 2007 WL 2826952.

. The gravamen of plaintiffs complaint—and most of the facts he marshals regarding his expectations of defendants' conduct—is not a challenge to the process of collecting the data from vehicles, but rather a challenge to the *use* of the data in administrative proceedings. Plaintiff claims that, because "the TLC issued repeated assurances that it would not use GPS tracking as a prosecutorial tool," there is thus "every reason for taxi drivers to expect that the agency would not track individuals and then use the collected evidence as the basis for regulatory charges and license revocations." (Mem. of L. in Supp. of Pl.'s Cross Motion ("Pl.'s Mot.") 18, ECF No. 22.) Plaintiff's conflation of collection and usage is unavailing here.

Essentially, plaintiff alleges, based on a set of facts involving defendants' statements about the T–PEP system (*see* Pl.'s 56.1 ¶¶ 16, 19), that he reasonably expected that defendants would "not use GPS tracking as a prosecutorial tool." (Pl.'s Mot. 18.) That may be the case, but that is legally irrelevant to the Fourth Amendment analysis here. The subsequent use of data does not create a privacy interest in the information that does not otherwise exist. *See Macon,* 472 U.S. at 469, 105 S.Ct. 2778 ("The mere expectation that the possibly illegal nature of a product will not come to the attention of the authorities . . . is not one that society is prepared to recognize as reasonable."). Plaintiff admits as much in his own brief, stating, "[W]hether a search was conducted depends not at all [on] where the fruits of that search are used." (Pl.'s Mot. 25.)

The only expectation that is relevant to the constitutional analysis of whether a search existed is an expectation of privacy in the data themselves. (*See* Pl.'s Mot. 18.) For the reasons set forth above, there is no reasonable expectation of privacy in such information. Though it is unnecessary to the legality of the search, the Court notes that there can be no plausible subjective expectation of privacy in the information at issue. Regulations not only mandate use of the T–PEP system but also require taxi drivers to create hand-written trip records if the system fails to operate, and have long required drivers to keep records of their activity. (Defs.' 56.1 ¶¶ 8–10.) *See, e.g., Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (explaining that the petitioner's "conduct was not and could not have been calculated to preserve the privacy of the number he dialed").

Nor does the analysis change even if, as plaintiff claims, the prosecutions of taxi drivers for overcharging had been impossible under the prior paper-record system. (*See* Pl.'s Mot. 20 ("Rate 4 prosecutions would have been impossible using the old tools.").) If no reasonable expectation of privacy existed in the collection of data regarding trip locations to begin with, then the ease of using such data to prosecute overcharging does not alter that expectation of privacy. *See Knotts,* 460 U.S. at 284, 103 S.Ct. 1081 ("Insofar as respondent's complaint appears to be simply that scientific devices such as the beeper allowed the police to be more effective in detecting crime, it simply has no constitutional foundation.").[2]

As a matter of constitutional law, plaintiff had no reasonable expectation of privacy in the data collected through the T–PEP system-regardless of the ends to which defendants ultimately used such data.

---

**2.** *Knotts* remains good law even after *Jones. See Jones,* 132 S.Ct. at 951–52. Plaintiff cites to *Weaver,* which found a reasonable expectation of privacy from GPS tracking in part because "[c]onstant, relentless tracking of anything is now not merely possible but entirely practicable." 12 N.Y.3d at 441, 882 N.Y.S.2d 357, 909 N.E.2d 1195. That decision is not binding here with regard to this Court's Fourth Amendment analysis with respect to the data at issue. It is also distinguishable for several reasons. As an initial matter, *Weaver* related to a private van, not vehicles regulated by the government and open to the public. *Id.* at 436, 882 N.Y.S.2d 357, 909 N.E.2d 1195. Furthermore, the collection of data from the T–PEP system is not "constant" or "relentless," *id.,* but rather limited to transmitting the locations of the start and end of each trip and the trip distance at pre-determined intervals. (Pl.'s 56.1 ¶¶ 2–3, 5.) The T–PEP system also transmits no data about taxicabs that are off-duty. (*See id.*) Justice Alito's concurrence in *Jones,* which also does not control, is similarly distinguishable. *See Jones,* 132 S.Ct. at 964 (Alito, J., concurring).

### b. *Physical Trespass on Plaintiff's Property.*

█ The Government also conducts a search within the meaning of the Fourth Amendment when it physically intrudes or trespasses upon an individual's "person[ ], house[ ], papers, [or] effects" for the purpose of obtaining information. *United States v. Jones,* —— U.S. ——, 132 S.Ct. 945, 949, 181 L.Ed.2d 911 (2012). This constitutes a search regardless of whether the individual maintains a reasonable expectation of privacy in the item searched. *See id.* at 952–53.

Plaintiff claims that defendants' collection of data through the T–PEP system was a search under *Jones* because defendants "mandated the installation of tracking devices in privately owned and operated taxicabs and monitored those devices for months and, in some cases, years." (Reply Mem. of L. in Supp. of Pl.'s Cross Mot. ("Pl.'s Reply") 5, ECF No. 34.) This case is not factually on all fours (or even close) with *Jones.*

In *Jones,* police officers had surreptitiously attached a GPS device to a Jeep Grand Cherokee registered to the wife of a suspected narcotics trafficker. *See Jones,* 132 S.Ct. at 948. The Court found the surreptitious attachment of the device to be a common-law trespass and therefore a search within the meaning of the Fourth Amendment. *See id.* at 952. The Court's decision was highly fact-specific and hinged heavily on the fact that the property in question was private. *See id.* at 949 ("It is important to be clear about what happened *in this case:* The Government physically occupied *private property* for the purpose of obtaining information.") (emphasis added).

█ Here, drivers are aware of the use of the T–PEP system. As the New York

Supreme Court recently explained in upholding the constitutionality of the TLC regulations at issue even after *Jones,* the "GPS monitoring occurred with the knowledge of the taxi driver," and the T–PEP "system was installed with the taxi owner's consent for the purpose of gathering information when a taxi driver is on duty about the location of trips and rates charged." *Carniol v. New York City Taxi & Limousine Comm'n,* 42 Misc.3d 199, 975 N.Y.S.2d 842, 849 (N.Y.Sup.Ct.2013). That alone is sufficient to distinguish the surreptitious use of the GPS device at issue in *Jones.*

In addition, New York City taxicabs are subject to regulations for public use, unlike the Jeep at issue in *Jones.* Plaintiff emphasizes that defendants' mandate applied to "privately owned taxicabs" and that "[t]axis are privately owned and operated." (Pl.'s Mot. 15.) However, as the Second Circuit has stated in the context of financial disclosure requirements, taxi medallion owners have a merely *"nominal* private status." *Statharos v. New York City Taxi & Limousine Comm'n,* 198 F.3d 317, 324 (2d Cir.1999) (emphasis added). The pervasive regulation of taxis and their openness to public use distinguishes them from the truly private property at issue in *Jones. See Carniol,* 975 N.Y.S.2d at 849 (distinguishing *Jones* because the "TTS and GPS do not record information about the driver's personal life").

Thus, mandating the installation of the T–PEP system and installing the system in compliance with regulations do not constitute a common-law trespass: taxi drivers are aware of the system, the system is installed pursuant to regulations, and the taxicabs in which the system is installed are not truly private vehicles. For that reason, *Jones* is inapposite,[3] as are the

---

**3.** *Jones* decidedly does not hold that "[i]t is

the method of gathering the information by

New York state court decisions to which plaintiff cites. Both *People v. Weaver*, 12 N.Y.3d 433, 443–45, 882 N.Y.S.2d 357, 909 N.E.2d 1195 (2009) and *Cunningham v. New York State Dep't of Labor*, 21 N.Y.3d 515, 519, 974 N.Y.S.2d 896, 997 N.E.2d 468 (2013), dealt with GPS devices that were surreptitiously installed on private vehicles.

For these reasons, defendants' actions here did not constitute a search within the meaning of the Fourth Amendment, whether under the "reasonable expectation of privacy" formulation or the *Jones* physical-trespass analysis.

### 2. *Reasonableness of the Search*

Even assuming *arguendo* that a search occurred because plaintiff had a reasonable expectation of privacy in the collected data or because defendants physically trespassed on plaintiff's property, plaintiff's Fourth Amendment claim still must fail, because any such search was reasonable under the circumstances. "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a government search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). While reasonableness generally requires obtaining a warrant, a search unsupported by probable cause and a warrant can be reasonable and thus constitutional where "special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable." *Id.* at 653, 115 S.Ct. 2386.

As Judge Cote explained in *Buliga*, defendants' collection of data—assuming it is a search—"qualifies for special needs analysis, since [it] is undeniably incompatible

GPS—even if it is the very same information—that causes the constitutional violation." (*See* Pl.'s Reply 9.) The surreptitious

with the normal requirement of a warrant and probable cause," "the collection regime leaves no discretion to law enforcement," and "the TLC regulation fulfills important purposes that could not be achieved by normal law enforcement methods." *Buliga*, 2007 WL 4547738, at *3 n. 5.

■ Special-needs analysis requires the examination of three factors: "(1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs," *Cassidy v. Chertoff*, 471 F.3d 67, 75 (2d Cir.2006). Evaluated under that framework, defendants' collection of plaintiffs data was reasonable.

■ First, plaintiff had a low privacy interest in the data collected through the T–PEP system, and the governmental intrusion was of a low degree. The data relate directly to plaintiff's work as a taxi driver, and regulations already required plaintiff to keep track of the information collected through the system. (Defs.' 56.1 ¶¶ 7–10.) Additionally, taxi drivers have a low privacy interest because "the taxi industry is pervasively regulated by the Commission." *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 324 (2d Cir.1999); *see Skinner v. Railway Labor Execs. Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (finding a low privacy interest for employees who participate an "industry that is regulated pervasively"); *Buliga*, 2007 WL 4547738, at *3 ("The information is directly related to job performance in a regulated industry.").

Furthermore, the governmental interest in collecting the data is substantial, and

physical trespass on a private vehicle was the determining factor there. *Jones*, 132 S.Ct. at 949.

the installation of the T–PEP system and collection of data through the system are an effective way to address that interest. "[T]he City of New York, acting through the TLC, 'has a substantial interest in promoting taxi customer service, taxicab ridership, and passenger and driver safety.'" *Buliga*, 2007 WL 4547738, at *4 (quoting *Alexandre*, 2007 WL 2826952, at *10). The City's collection of T–PEP data is directly related to those goals; for example, the City can use the data to ensure that taxi drivers are driving their vehicles the minimum amount required by regulations or to ensure that drivers are not systematically overcharging passengers. Meanwhile, because defendants only collect information related to the locations and times of the start and end of each trip and the trip distance, and only collect information while drivers are on duty (Ackman Decl. Ex. 2, at § 3–06(b); Pl.'s 56.1 ¶¶ 3, 5; Defs.' Resp. to Pl.'s Statement of Material Facts ("Defs.' Resp.") ¶¶ 56, ECF No. 28), there is little likelihood that defendants will obtain personal information through this system—thus rendering it an effective means of addressing the governmental need in question. *See Ontario v. Quon*, 560 U.S. 746, 130 S.Ct. 2619, 2631–32, 177 L.Ed.2d 216 (2010); *Buliga*, 2007 WL 4547738, at *4.

Plaintiff argues that the special-needs exception to the warrant requirement cannot apply here because defendants used T–PEP data "not for general statistical purposes or to craft policy or to find lost property," but "for purposes of filing charges." (Pl.'s Mot. 29.) Again, plaintiffs objection is to the *use* of data. Plaintiff admits that the TLC could, under the special needs exception, constitutionally "mandate installation of GPS devices in taxis for … data collection and recovery of lost property." (Pl.'s Reply 7.) That is enough to support defendants' actions as constitutional under the special-needs exception.[4]

For these reasons, even assuming that defendants' actions here constituted a search, that search was reasonable under the special-needs analysis of the Fourth Amendment.[5]

### B. *Supplemental Jurisdiction Over Plaintiff's State–Law Claims*

As set forth above, defendants' collection of data regarding plaintiff through the T–PEP system was not a search within the meaning of the Fourth Amendment; assuming that it was a search, such a search was reasonable as a matter of law. There-

---

**4.** Plaintiff cites *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), for the proposition that the special-needs exception only applies to searches performed for reasons completely unrelated to law enforcement, and that defendants collected data in this case "for purposes of filing charges." (Pl.'s Mot. 28–29.) However, in *Edmond*. the government checkpoint at issue "unquestionably ha[d] the *primary purpose* of interdicting illegal narcotics," thus rendering the special-needs exception unavailable. 531 U.S. at 40, 121 S.Ct. 447 (emphasis added). Here, the T–PEP system here is part of a pervasive regulatory scheme with many purposes—such as collecting data, finding lost property, and stopping overcharging—all in service of the TLC's "substantial

interest in promoting taxi customer service, taxicab ridership, and passenger and driver safety." *Buliga*, 2007 WL 4547738, at *4; *see also United States v. Martinez–Fuerte*, 428 U.S. 543, 557, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upholding random traffic checkpoint stops that were part of a complex scheme of border policing).

**5.** Because no search occurred here, and any search was in any event reasonable, the Court need not reach plaintiff's additional arguments that taxi drivers never consented to the TLC's GPS searches or that the TLC cannot establish the "administrative search" exception to the warrant requirement. (Pl.'s Mot. 22–28.)

469

fore, defendants are entitled to summary judgment on defendants' first cause of action. (*See* Compl. ¶¶ 113–117.) Plaintiff's remaining causes of action are state-law claims, alleging violations of the New York Constitution, Article 78 of the New York Civil Practice Law and Rules, and the New York City Charter, as well as fraudulent inducement by the TLC. (*See* Compl. ¶¶ 118–126.)

The Court may decline to exercise supplemental jurisdiction over state-law claims if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction." *Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir.2006) (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

Here, the assertion of supplemental jurisdiction over plaintiff's state-law claims would be inappropriate in the absence of related federal claims. No state-law cause of action alleged in plaintiff's complaint implicates a federal question or any issue of federal policy or interest. *See Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir.1998) (noting that it is particularly appropriate for a district court to dismiss state-law claims where "the federal claim on which the state claim hangs has been dismissed"); *Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir.1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Furthermore, the case remains in early stages. *See Valencia v. Lee*, 316 F.3d 299, 306 (2d Cir.2003) (explaining that declining supplemental jurisdiction over state-law claims is appropri-ate where federal claims have been dismissed at a relatively early stage).

For these reasons, the Court dismisses plaintiff's state-law claims "so that state courts can, if so called upon, decide for themselves whatever questions of state law this case may present." *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001).

## IV. *CONCLUSION*

For these reasons, defendants' motion for summary judgment is GRANTED, and plaintiff's motion for summary judgment is DENIED. The Clerk of Court is directed to close the motions at ECF Nos. 11 and 17 and to terminate this action.

SO ORDERED.