14-405-cv
*El-Nahal v. Yassky, et al.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2014

(Argued: December 11, 2014          Decided: August 26, 2016)

No. 14-405-cv

_____

HASSAN EL-NAHAL, individually and on behalf of all others similarly situated,
*Plaintiff-Appellant*,


-v.-


DAVID YASSKY, COMMISSIONER MATTHEW DAUS, MICHAEL BLOOMBERG, THE CITY
OF NEW YORK,
*Defendants-Appellees*.


_____


Before: POOLER, LIVINGSTON, and DRONEY, *Circuit Judges*.


Appeal from a judgment of the United States District Court for the Southern District of New York (Forrest, *J.*), granting summary judgment to Defendants-Appellees, the City of New York and various of its employees, on Plaintiff-Appellant Hassan El-Nahal's 42 U.S.C. § 1983 claim that Defendants-Appellees violated his Fourth Amendment rights by mandating the installation of tracking systems in taxicabs, thereby trespassing or physically intruding upon property for the purposes of gathering information. Because we find no genuine issue of material fact as to whether a trespass or physical intrusion occurred with

1

respect to any property of El-Nahal, we conclude that summary judgment was appropriate, and therefore **AFFIRM** the judgment of the district court.

Judge POOLER concurs in part and dissents in part in a separate opinion.

DANIEL L. ACKMAN, Law Office of Daniel L. Ackman, New York, N.Y., *for Plaintiff-Appellant*.

ELIZABETH S. NATRELLA, for Zachary W. Carter, Corporation Counsel of the City of New York (Richard Dearing, Pamela Seider Dolgow, *on the brief*), New York, N.Y., *for Defendants-Appellees*.

DEBRA ANN LIVINGSTON, Circuit Judge:

Plaintiff-Appellant Hassan El-Nahal ("El-Nahal"), a New York City taxi driver, brought a 42 U.S.C. § 1983 suit in the United States District Court for the Southern District of New York (Forrest, *J.*), principally alleging that the New York City Taxi and Limousine Commission ("TLC") — through Defendants-Appellees Matthew Daus, a former chairman of the TLC; David Yassky, then-chairman of the TLC; Michael Bloomberg, then-Mayor of New York City; and the City of New York (collectively, "Defendants") — had deprived him of his Fourth Amendment rights in various ways. As relevant to this appeal, El-Nahal argued that the TLC's mandate that all New York City taxicabs install technology systems equipped with Global Positioning System ("GPS") tracking abilities amounted to a property-based search pursuant to *United States v. Jones*, 132 S. Ct.

2

945 (2012), and that this search violated his Fourth Amendment rights. The District Court granted summary judgment to Defendants on all of El-Nahal's Fourth Amendment claims, including his *Jones* claim, which is the only issue before us on appeal. Because the record is devoid of evidence as to whether El-Nahal had any interest in a taxi at the time of an alleged trespass or physical intrusion, El-Nahal failed to make a sufficient showing on an essential element of his property-based Fourth Amendment claim and Defendants were entitled to summary judgment. Accordingly, we **AFFIRM** the district court's grant of summary judgment to Defendants.

## I.

### A. Background

The TLC is an agency of the City of New York that is tasked with the "regulation and supervision of the business and industry of transportation of persons by licensed vehicles for hire in the city." N.Y.C., N.Y., Charter ch. 65, § 2303a. Its duties include the regulation of "rates," "standards and conditions of service," "[r]equirements of standards of safety and . . . efficiency in the operation of vehicles and auxiliary equipment," and the "establishment of . . . [a] uniform system of accounts," which entails "the right . . . to inspect books and

3

records and to require the submission of such reports as the commission may determine." *Id.* § 2303b. Pursuant to the New York City Administrative Code, the TLC may promulgate rules as necessary to implement its authority. N.Y.C., N.Y., Code § 19-503(a).

In 2004, the TLC promulgated a rule requiring that all New York City taxicabs begin to use a Taxicab Technology System ("TTS"), a physical device located in the backseat of taxicabs that would, among other things, provide credit and debit card payment services for customers, as well as transmit to the TLC electronic data about trips made by taxi drivers gathered by means of GPS. *See* N.Y.C., N.Y., Rules tit. 35, § 1-01 (2010). Through the TTS, the TLC would collect — only when drivers were on duty — "the taxicab license number; the taxicab driver's license number; the location of trip initiation; the time of trip initiation; the number of passengers; the location of trip termination; the time of trip termination; the metered fare for the trip; and the distance of the trip." *Id.* § 3-06(b). Prior to the implementation of the TTS rule, the TLC required drivers to provide this same information in the form of handwritten trip records. The TTS rule mandated that taxicab medallion owners procure TTSs in their taxis by August 1, 2007. *Id.* § 1-11(g).

4

Around the same time as the TLC promulgated the TTS rule, the TLC also established a new system for taxi fare "rate codes," corresponding to different types of fares a taxi driver may charge. Rate Code 1, for instance, is the standard New York City rate and is used for fares from point-to-point within New York City. Rate Code 4, meanwhile, doubles the fare for each additional unit driven, and may be engaged by a taxi driver only under certain circumstances upon entering Nassau or Westchester County.

In March 2010, the TLC issued a press release announcing that it had discovered that some taxicab drivers were using the Rate Code 4 setting to overcharge passengers. "Using GPS technology installed in taxicabs," the press release explained, the "TLC has discovered 1,872,078 trips where passengers were illegally charged the higher rate" by 35,558 drivers for a total of $8,330,155 in alleged overcharges. J.A. 135. The press release qualified this finding by noting that "there were 361 million taxi trips during that time period, so the illegal fare was only charged in 0.5% of all trips," and that the alleged "scam was primarily perpetrated by a small number of drivers, with 3,000 drivers overcharging more than 100 times." *Id.*

Two months later, in May 2010, the TLC issued a second press release that modified its initial findings, announcing that the "TLC's completed analysis" revealed that "21,819 taxicab drivers overcharged passengers a total of 286,000 times . . . for a total estimated overcharge of almost $1.1 million." J.A. 146. The press release added that the TLC believed that 13,315 out of the 21,819 drivers had "engaged in overcharging just one or two times," but that it expected "to be able to prove that some drivers engaged in 1,000 or more overcharges." *Id.* In response to the scandal, the Manhattan District Attorney's office arrested 59 drivers "for defrauding and stealing from their customers," J.A. 150, and the TLC programmed passenger screens to display "a highly visible alert that advises riders when the higher, out of town rate is activated," J.A. 151. The TLC also brought administrative actions against many drivers.

Among those who faced administrative charges was El-Nahal, who at that point had been a taxi driver for more than twenty years. On January 3, 2012, the TLC sent El-Nahal a letter directing him to appear for a settlement conference in reference to allegations that he overcharged passengers on 10 occasions between November 20, 2009 and February 22, 2010 by improperly using the Rate 4 code. El-Nahal contested the allegations. On May 7, 2012, an administrative law judge

6

found, based on trip records the TLC allegedly obtained via GPS, that El-Nahal violated the TLC's rules on six occasions. The administrative law judge thus imposed upon El-Nahal $550 in penalties and revoked El-Nahal's TLC license to drive taxis. On appeal, the Office of Administrative Trials and Hearings Taxi and Limousine Tribunal Appeals Unit ("Appeals Unit") overturned the penalty, ruling that the administrative law judge's decision was "not supported by substantial evidence." J.A. 187. The TLC then re-filed regarding one violation, and the administrative law judge found El-Nahal not guilty. Undeterred, the TLC re-filed five other charges against El-Nahal, and a different administrative law judge once again found El-Nahal guilty, imposed a fine, and revoked his license. El-Nahal again appealed, and the Appeals Unit again overturned the administrative law judge's decision on the ground that the administrative law judge's findings with respect to El-Nahal's alleged intent to overcharge were insufficient. Nonetheless, the TLC re-filed charges against El-Nahal once more. An administrative law judge yet again found El-Nahal guilty, based in part on GPS trip records and Google maps, and the Appeals Unit yet again reversed the decision on appeal. In reversing, the Appeals Unit dismissed the charges with prejudice and emphasized that the GPS evidence used to convict El-Nahal could

not, by itself, show that El-Nahal "intended to overcharge, only that he did overcharge." J.A. 216.

## B. Procedural History

On May 31, 2013, El-Nahal filed his complaint.[1]  As relevant here, the complaint alleged that "[t]he installation and use of [the] GPS device [through the TTS] . . . constitutes a[n unlawful] search under the Fourth Amendment." J.A. 34.  The complaint also alleged violations of the New York Constitution, Article 78 of the New York Civil Practice Laws and Rules, the New York City Charter, and New York common law.

On August 21, 2013, Defendants moved to dismiss El-Nahal's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Attached to the motion were seventy-two pages of exhibits.  At an initial pretrial conference held on September 13, 2013, Judge Forrest converted Defendants' motion to dismiss into a motion for summary judgment and directed El-Nahal to file his opposition to Defendants' motion for summary judgment and his own motion for summary judgment by September 24, 2013.  On September 24, 2013, El-Nahal cross-moved for partial summary judgment with respect to his § 1983 and New

---

[1] Although El-Nahal filed the complaint on behalf of himself and similarly situated individuals, he at no point in the district court proceedings sought class certification.

York Constitution claims, and opposed Defendants' motion for summary judgment.

By order dated January 29, 2014, the district court granted Defendants' motion for summary judgment on El-Nahal's § 1983 claim, and dismissed the state claims for lack of supplemental jurisdiction. *El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 469–70 (S.D.N.Y. 2014). The district court held that the installation and use of the TTS did not constitute a search for the purposes of the Fourth Amendment. As to whether the challenged conduct intruded on El-Nahal's reasonable expectation of privacy, the district court, citing our decision in *Buliga v. N.Y.C. Taxi & Limousine Comm'n*, 324 F. App'x 82, 82 (2d Cir. 2009) (affirming a district court's ruling that the TLC rule requiring the installation of a TTS in all taxis did not invade the plaintiff's reasonable expectation of privacy), concluded that El-Nahal had no "reasonable expectation of privacy in any of the information collected" by the TTS. *El-Nahal*, 993 F. Supp. 2d at 465. Regarding El-Nahal's claim that the mandatory installation of the TTS was a search because it involved a physical intrusion for the purpose of obtaining information, the district court rejected the claim on the grounds that "taxi drivers are aware of the system, the system is installed pursuant to regulations, and the taxicabs in which

9

the system is installed are not truly private vehicles." *El-Nahal*, 993 F. Supp. 2d at 467. The district court further reasoned that even assuming, *arguendo*, that the mandatory installation of the TTS did constitute a search for Fourth Amendment purposes, the search was justified pursuant to the "special needs" doctrine. *Id.* at 469. El-Nahal timely appealed.

## II.

"We review an award of summary judgment *de novo*." *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994). Upon proper motion, Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23 (quoting Fed. R. Civ. P. 56(c) (1963) (current version at Fed. R. Civ. P. 56(a) (2010))). Thus, "[t]he moving party is 'entitled to a judgment as a matter of law'

10

because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323 (quoting Fed. R. Civ. P. 56(c) (1963) (current version at Fed. R. Civ. P. 56(a) (2010))); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (noting that "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim").

\* \* \*

El-Nahal argues that the district court erred by granting summary judgment on his Fourth Amendment claim because pursuant to *Jones*, "[p]hysical placement of a tracking device on a private vehicle in order to obtain information is . . . a search," so that his Fourth Amendment rights were violated when "[t]he TLC mandated the physical placement of tracking devices in privately owned taxicabs." Appellant's Br. at 29. El-Nahal has not argued on appeal that he was subjected to a search by virtue of an intrusion on any reasonable expectation of privacy he had regarding the installation and use of the TTS.[2] Instead, he asserts

---

[2] The reasonable-expectation-of-privacy approach for deciding whether a search has occurred within the meaning of the Fourth Amendment derives from Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347 (1967), which affirms that the Fourth Amendment protects against invasions upon an

11

here that he "explicitly 'rejected the premise' of defendants' argument below that he was required to demonstrate an invasion of privacy" and that his Fourth Amendment claim "does not depend on whether his expectation of privacy was violated." Appellant's Br. at 31–32. Accordingly, we address the only argument El-Nahal has presented on appeal: namely, his contention that the district court erred in concluding that summary judgment was warranted as to his property-based Fourth Amendment claim. Assuming, *arguendo*, that the TLC-mandated installation and use of TTS devices in taxicabs in New York City may constitute a search as to those with sufficient property-based interests in a taxicab, we conclude that the district court nevertheless properly granted summary judgment because there is no evidence in the record as to an essential element of El-Nahal's claim on which he bears the burden of proof: namely, that he had such a property interest in a taxicab at the time a TTS was installed.[3]

---

individual's "reasonable expectation of privacy." *Id.* at 360 (Harlan, J., concurring); *see Smith v. Maryland*, 442 U.S. 735, 740 (1979) ("Consistently with *Katz*, this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." (citing cases)).

[3] We thus affirm on an alternative ground and do not consider the district court's conclusions: (1) that Defendants' actions "did not constitute a search within the meaning of the Fourth Amendment . . . under . . . the *Jones* physical-

*Jones* itself demonstrates that a plaintiff such as El-Nahal must establish such a property-based interest.  In *Jones*, the Supreme Court made clear that the reasonable-expectation-of-privacy test did not supplant, but merely supplemented the earlier, property-based approach to defining the circumstances in which a "search," for Fourth Amendment purposes, has occurred.  132 S. Ct. at 949–50.  There, the Government placed a GPS tracking device on the undercarriage of a Jeep that was, as the Government acknowledged, exclusively driven by Jones.[4]  *Id.* at 948–49 & n.2.  The Government then tracked the Jeep's movements for 28 days, using information gleaned from the tracking in Jones's prosecution for several drug offenses.  *Id.* at 948–49.  The *Jones* Court instructed that pursuant to the property-based approach, a Fourth Amendment search "undoubtedly occur[s]" when the Government acts to "obtain[] information by physically intruding on a

---

trespass analysis;" and (2) that assuming, *arguendo*, that a search occurred, "that search was reasonable under the special-needs analysis of the Fourth Amendment."  *El-Nahal*, 993 F. Supp. 2d at 468–69.

[4] Because the Government conceded that Jones was "the exclusive driver" of the Jeep, *Jones*, 132 S. Ct. at 949 n.2 (quoting *United States v. Maynard*, 615 F.3d 544, 555 n.* (D.C. Cir. 2010), *aff'd on other grounds sub nom. United States v. Jones*, 132 S. Ct. 945 (2012)), even if Jones was "not the owner" of the Jeep, the Supreme Court noted, he "had at least the property rights of a bailee," *id.*

constitutionally protected area," *id.* at 950 n.3 — that is, on individuals' "persons,

houses, papers, and effects," as enumerated in the Fourth Amendment's text,

U.S. Const. Amend. IV.[5]

Because Government agents had physically intruded on Jones's Jeep,

which was "beyond dispute . . . an 'effect' as that term is used in the [Fourth]

Amendment," *Jones*, 132 S. Ct. at 949, to plant and employ a tracking device, the

Supreme Court concluded that it need not consider the reasonable-expectation-

of-privacy approach in determining whether Jones was subject to a search, *see id.*

at 950–53.  Applying the property-based approach, the Court held "that the

Government's installation of a GPS device on a target's vehicle, and its use of

that device to monitor the vehicle's movements, constitutes a 'search.'"  *Id.* at 949.

Thus, Jones was subject to a search because the Government installed a GPS

device on *his* vehicle in order to obtain information — on a vehicle that, while

registered to his wife, he exclusively drove and in which (as the Court took pains

to note) he "had at least the property rights of a bailee" at the time the

Government installed the tracking device.  *Id.* at 949 n.2.

---

[5] The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.

The centrality of some property interest to a property-based Fourth Amendment claim is also evident in the manner in which the *Jones* Court distinguished *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984). In *Knotts* and *Karo*, the Government had installed beepers — "radio transmitter[s], usually battery operated, which emit[] periodic signals that can be picked up by a radio receiver," *Knotts*, 460 U.S. at 277 — into containers of chemicals that were thereafter tracked, and that the Government suspected would be used in connection with the manufacture of illegal drugs, *see id.* at 278–79; *see also Karo*, 468 U.S. at 708–09. The Government argued in *Jones* that *Knotts* and *Karo* "foreclose[d] the conclusion that what occurred [to Jones] constituted a search" because in these earlier cases, the Court, employing the reasonable-expectation-of-privacy approach, had determined that using a beeper to track the movement of the containers on public roads did not constitute a search. 132 S. Ct. at 951. The *Jones* Court disagreed, concluding that the outcomes in *Knotts* and *Karo* were "perfectly consistent" with its property-based approach to the Fourth Amendment's scope. *Id.* at 952.

As *Jones* explained, the Government in *Knotts* had installed the beeper in the container at issue "*before it came into Knotts'*[s] *possession*, with the consent of

15

the then-owner" of the container. *Id.* (emphasis added). Knotts did not challenge the installation, and the Court "specifically declined to consider its effect." *Jones*, 132 S. Ct. at 952. Similarly, the *Jones* court explained that in *Karo*, "[a]s in *Knotts*, . . . [t]he Government . . . came into physical contact with the container only *before it belonged to the defendant Karo*" and with the consent of its then-owner: "Karo accepted the container as it came to him, beeper and all, and was therefore not entitled to object to the beeper's presence, even though it was used to monitor the container's location." *Id.* (emphasis added). Jones, meanwhile, was on "much different footing" than Knotts or Karo: he "possessed the Jeep *at the time the Government trespassorily inserted* the information-gathering device." *Id.* (emphasis added); *see also* Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 2.7(f) (5th ed. 2012) (noting that "the date of the requisite trespass" rather than the "period of surveillance" is critical to assessing whether a search has occurred pursuant to *Jones*'s property-based approach). Because the physical intrusion was upon a constitutionally protected area and was undertaken for the purpose of obtaining information, the Government's conduct amounted to the type of property-based search that the Fourth Amendment protects against. *Jones*, 132 S. Ct. at 949.

To be clear, because there was no dispute in *Jones* that the defendant lawfully possessed the Jeep at the time it was trespassed upon, nor did the Government challenge the D.C. Circuit's determination "that the vehicle's registration did not affect [Jones's] ability to make a Fourth Amendment objection," the *Jones* Court had no occasion fully to consider the nature of the property interest that is sufficient to make out a property-based Fourth Amendment claim. *Id.* at 949 n.2. Neither need we do so here. Because we can discern no evidence at all that El-Nahal had *any* interest in a particular taxicab at the time of an alleged trespass or physical intrusion, we find no genuine issue of material fact warranting a trial. Summary judgment in favor of Defendants was therefore wholly proper.

During the proceedings that led to summary judgment in favor of Defendants, Defendants repeatedly stated that the property-based approach in *Jones* was predicated upon physical intrusion on property, and emphasized how *Jones* differed from *Knotts* and *Karo*. For instance, Defendants' opening memorandum of law explained that, unlike the defendant in *Jones*, there was no physical occupation of El-Nahal's property for the purpose of obtaining information because, as in *Knotts* and *Karo*, "the initial placement of the monitor

17

was not at issue."  Defs.' Mem. of L. in Supp. at 11, *El-Nahal v. Yassky*, 993 F. Supp. 2d 460 (S.D.N.Y. 2014) (No. 13-cv-3690 (KBF)), ECF No. 13.  Since the "physical placement of the GPS device" was not at issue, Defendants continued, *Jones* had "little relevance in Plaintiff's claim."[6] *Id.*  It logically followed from that statement that if *Jones was* to have any relevance, El-Nahal had to put the placement of the GPS device at issue — a point he implicitly acknowledged in his own papers in opposition to Defendants' motion and in support of his cross motion for summary judgment by stating that "[t]he Court's decision [in *Jones*] was based on a traditional understanding of the Fourth Amendment tied to common law trespass" and "the physical attachment of the device," Pl.'s Mem. of L. in Supp. at 15-16, *El-Nahal v. Yassky*, 993 F. Supp. 2d 460 (S.D.N.Y. 2014) (No. 13-cv-3690 (KBF)), ECF No. 22, and that *Jones* "focused on the [G]overnment's trespass on *Jones'*[s] *vehicle*," *id.* at 19 (emphasis added).

---

[6] Defendants reiterated this crucial aspect of *Jones* in their opposition to El-Nahal's cross-motion for summary judgment on the search claim.  Defs.' Mem. of L. in Opp. at 12, *El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 469–70 (S.D.N.Y. 2014) (No. 13-cv-3690 (KBF)), ECF No. 30.  They did so yet again in their reply memorandum in support of their own motion for summary judgment, devoting an entire section of their brief specifically to the a that "[t]here [w]as [n]o [t]respass on Plaintiff's [p]erson or [p]roperty [c]onstituting a [s]earch."  Defs.' Reply Mem. of L. in Supp. at 7, *El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 469–70 (S.D.N.Y. 2014) (No. 13-cv-3690 (KBF)), ECF No. 36.

Defendants thus "point[ed] out to the district court . . . that there [was] an absence of evidence," *Celotex*, 477 U.S. at 325, to support "an essential element" of El-Nahal's *Jones* claim, *id.* at 323. It then fell to El-Nahal to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" as to that element of his Fourth Amendment claim. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see also Tovar v. KLM Royal Dutch Airlines*, No. 98 Civ. 5178(LAP), 2000 WL 1273841, at *5–6 (S.D.N.Y. Sept. 6, 2000) (in converting defendants' motion to dismiss to a motion for summary judgment, noting that defendants may satisfy their burden by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim," at which point the burden "shifts to the [plaintiff] to come forward with 'specific facts showing that there is a genuine issue for trial'" (quoting *Goenaga*, 51 F.3d at 18; Fed. R. Civ. P. 56(e))). Yet, El-Nahal adduced no evidence as to the circumstances surrounding any alleged trespass or physical intrusion on a taxicab in which he had a property-based interest.

Here, El-Nahal emphasizes that he drives a taxicab and that the TLC mandated the physical placement of a TTS in all privately owned cabs. But this

19

is not enough to show that the physical placement of a TTS intruded on a constitutionally protected area *of El-Nahal*. Even if El-Nahal at some point drove a taxicab installed with a TTS, this fact, standing alone, is no more relevant than the fact that Knotts and Karo at some point possessed containers installed with beepers. As *Jones* makes plain, the possibility that the Government may have trespassed or physically intruded on *someone*'s property does not necessarily entitle *someone else* who *later acquires* an interest in that property to claim that the Government trespassed or physically intruded on her property.

El-Nahal provided no evidence describing his interest in a taxi at the time of an alleged trespass or physical intrusion. Beyond stating that he has been a taxicab driver for more than 20 years, El-Nahal leaves it a mystery whether he owns a taxicab medallion (and it is the *owners* of such medallions that TLC regulations require to equip their taxicabs with a TTS, N.Y.C., N.Y., Rules tit. 35, § 1-11(f)–(g) (2010)), rents a taxi from a corporate owner on a daily or weekly basis, or alternates driving shifts with another driver who rents a cab. Moreover, he has said *nothing at all* as to what interest he had in a particular taxi (if any) at the time it was installed with a TTS. Thus, so far as the record here discloses, El-Nahal may have rented a taxi after its owner contracted with a third-party

provider to install a TTS, fully cognizant of the presence of the TTS in the cab, and even taking custody of the cab on the condition that he properly maintain the TTS while operating the taxi. *Cf. Jones*, 132 S. Ct. at 961 (Alito, J., concurring) (noting that "the [*Jones*] theory would provide no protection" if "the Federal Government required or persuaded auto manufacturers to include a GPS tracking device in every car"). *Jones* leaves no doubt that in such a case, a property-based search claim would be lacking.

That the parameters of the property-based search theory outlined in *Jones* were not fully explicated in that case makes it all the more remarkable that El-Nahal has failed to adduce evidence on one aspect of *Jones* that *is* clear: to claim that the Government trespassed or physically intruded upon one's constitutionally protected area for the purposes of gathering information, a plaintiff must establish a property interest in a constitutionally protected area at the time of the intrusion. Here, El-Nahal has provided no evidence tending to show that he had an interest in any taxi at the time of an alleged trespass or physical invasion — an element that, whether dependent on or divergent from common-law tort principles, we have described as "the touchstone for the analysis in *Jones*." *See United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013)

21

(Pooler, J.). No reasonable jury could find for El-Nahal on his claim that the Government's conduct constituted a search under *Jones*, and there is nothing for us to do but to affirm the district court's grant of summary judgment to Defendants. Accordingly, finding no genuine issue of material fact warranting a trial, we **AFFIRM** the judgment of the district court.

POOLER, *Circuit Judge*, concurring in part and dissenting in part:

I concur in the majority's excellent analysis of the line between *United States v. Jones*, 132 S. Ct. 945 (2012), on the one hand, and *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984), on the other hand. Indeed, had Defendants pressed the same analysis before the district court, I would join the majority in holding that Defendants had successfully shifted the burden to El-Nahal to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" on the issue of El-Nahal's property interest in the taxi at the time of the alleged trespass, *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and that El-Nahal failed to meet this burden.

I disagree, however, that Defendants "point[ed] out to the district court . . . an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The majority relies on Defendants' statements that "the initial placement of the monitor was not at issue," Defs.' Mem. of L. in Supp. at 11, *El-Nahal v. Yassky*, 993 F. Supp. 2d 460 (S.D.N.Y. 2014) (No. 13-cv-3690 (KBF)), ECF No. 13; Defs.' Mem. of L. in Opp. at 12, *El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 469–70 (S.D.N.Y. 2014) (No. 13-cv-3690 (KBF)), ECF No. 30, that because the "physical placement of the GPS device in the vehicles is not at issue" *Jones* "has little or no relevance in Plaintiff's claim," Defs. Mem. of L. in Supp. at 11, and the analysis following the heading "There Was No Trespass on Plaintiff's Person or Property Constituting a Search," the only even arguably relevant portion of which merely again

stated that "the physical placement of the GPS device in the vehicles is not at issue."

Defs.' Reply Mem. of L. in Supp. at 7, *El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 469–70 (S.D.N.Y. 2014) (No. 13-cv-3690 (KBF)), ECF No. 36. Thus, in 64 pages of briefing by Defendants, the only statement referring to an absence of evidence on the point of El-Nahal's interest in the taxi at the time of the trespass is that "the physical placement of the GPS device in the vehicles is not at issue." I, quite frankly, do not know what this statement means. While the majority draws nuanced lines between *Jones* and *Knotts* and *Karo*, showing the importance of an ownership interest at the time of the trespass, *at most* Defendants implicitly hint at such a distinction. I do not think this was sufficient to shift the burden to El-Nahal to provide evidence of his property interest in the taxi.

It is evident, moreover, that the district court did not read these statements in the same manner as does the majority, as the district court held that *Jones* did not control on the grounds that the trespass in *Jones* was surreptitious, that taxis are not truly private property, and that the system was installed pursuant to regulations. *See El-Nahal v. Yassky*, 993 F. Supp. 2d 460, 467-68 (S.D.N.Y. 2014). Although I agree that the majority need not reach these issues, *see* Maj. Op. at 12 n.3, in my view, they were decided incorrectly.

As an initial matter, I cannot agree that the surreptitious nature of the intrusion was a critical factor to the holding in *Jones*. Beyond the fact that the *Jones* majority never characterized the intrusion in this manner, its reasoning expressly disclaimed any reliance on the target's expectations regarding the possibility of surveillance. The physical invasion of a constitutionally protected area is no less actionable under the Fourth

2

Amendment merely because it is conspicuous. *See, e.g.*, *United States v. Isiofia*, 370 F.3d 226, 232-33 (2d Cir. 2004) (holding that a warrantless home search was unconstitutional where the defendant witnessed the search and gave consent, later found to be involuntary).[1] To hold otherwise would allow the government to conduct unreasonable searches merely by announcing them. But the government could not, for instance, eliminate the Fourth Amendment's protection of "homes, papers, and effects" if it "were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry." *Smith v. Maryland*, 442 U.S. 735, 740 n.5 (1979). Accordingly, El-Nahal's awareness of the GPS does not preclude the finding that the surveillance entailed a search.

Nor, in my view, is the fact that the GPS was installed pursuant to an administrative rule dispositive. On numerous occasions, the Supreme Court has addressed statutes and regulations implicating Fourth Amendment rights. For instance, in *Grady v. North Carolina*, 135 S. Ct. 1368 (2015), the Supreme Court applied *Jones*'s reasoning in evaluating a state statute mandating the satellite-based monitoring of certain categories of recidivist sex offenders. By unanimous opinion, the Court concluded that "a State . . . conducts a search when it attaches a device to a person's body, without consent, for the

---

[1] Indeed, this point is illustrated by *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765), a case the Supreme Court has described as "undoubtedly familiar to every American statesman at the time the Constitution was adopted, and considered to be the true and ultimate expression of constitutional law with regard to search and seizure." *Jones*, 132 S. Ct. at 949 (internal quotation marks omitted). In *Entick*, the plaintiff prevailed in an action for trespass after the King's messengers, acting under the claimed authority of a general warrant, "with force and arms" entered and searched his dwelling "against his will."

3

purpose of tracking that individual's movements," *id.* at 1370, a decision not changed by the fact that this search was conducted pursuant to statute. *See id.* at 1371 (rejecting argument that this was not unconstitutional because the "State's monitoring program is civil in nature"); *see also Maryland v. King*, 133 S. Ct. 1958, 1968-69 (2013) (considering the constitutionality under the Fourth Amendment of DNA swabs taken pursuant to Maryland statute). Most recently, in *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015), the Supreme Court struck down a city ordinance requiring hotels to permit the warrantless inspection of their guest records on the basis that it authorized a regime of unreasonable searches without opportunity for precompliance review. *Id.* at 2447-48, 2451-53. Plainly, the government's physical intrusion on a constitutionally protected area is subject to Fourth Amendment scrutiny even if the intrusion is authorized by municipal regulations.

With respect to whether the taxi was constitutionally protected property, the district court answered in the negative, reasoning that "[t]he pervasive regulation of taxis and their openness to public use distinguishes them from the *truly* private property at issue in *Jones*." *El-Nahal*, 993 F. Supp. 2d at 467 (emphasis added). Although I agree that taxicabs differ from noncommercial vehicles in important respects, in my view, these distinctions do not strip them of all Fourth Amendment protections. *If* the taxi was El-Nahal's private personal property, *Jones* dictates that such property qualifies as "an 'effect' as that term is used in the [Fourth] Amendment." 132 S. Ct. at 949 ("It is important to be clear about what happened in this case: The Government physically occupied private property for the purpose of obtaining information."). As such, it was

4

entitled to special "Fourth Amendment significance" as "one of those protected areas enumerated" in the constitutional text. *Id.* at 953. At bottom, the Court must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* at 950 (alteration in original) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). "The Framers would have understood the term 'effects' to be limited to personal, rather than real, property." *Oliver v. United States*, 466 U.S. 170, 177 n.7 (1984). The term was not limited, however, to personal property of a *noncommercial* nature. It included "the goods of a merchant [or] tradesman." *Altman v. City of High Point*, 330 F.3d 194, 201 (4th Cir. 2003) (quoting Dictionarium Britannicum (Nathan Baily ed., 1730)).

To recount now familiar history, "one of the primary evils intended to be eliminated by the Fourth Amendment was the massive intrusion on privacy undertaken in the collection of taxes pursuant to general warrants and writs of assistance." *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 355 (1977). "The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of British tax laws." *Payton v. New York*, 445 U.S. 573, 583 n.21 (1980). The "particular offensiveness" engendered by these general warrant "was acutely felt by the *merchants and businessmen* whose *premises and products* were inspected for compliance with the several parliamentary revenue measures." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311 (1978) (emphasis added).

Consistent with this purpose, "[o]ur prior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative

5

inspections of private commercial property." *Spinelli v. City of New York*, 579 F.3d 160, 167 (2d Cir. 2009). The Fourth Amendment is therefore implicated by searches conducted by regulatory authorities involving the unlicensed "physical entry" on a business's private property. *See G. M. Leasing Corp.*, 429 U.S. at 354 (indicating that Fourth Amendment would be implicated by "warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer").

The conclusion that TLC's rule worked an unlicensed physical intrusion on a constitutionally protected effect is not altered by the taxicab's "openness to public use." *El-Nahal*, 993 F. Supp. 2d at 467. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). An implied license therefore permits regulatory officials to do what "any private citizen might do," without implicating the Fourth Amendment. *See Florida v. Jardines*, 133 S. Ct. 1409, 1416 (2013) (quoting *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011)). A government agent, in the same manner as a private person, may hail a taxi when it is on duty and physically occupy it for the duration of a trip. *See Maryland v. Macon*, 472 U.S. 463, 470 (1985). But, without the driver's leave, a typical passenger may not dust the car's interior for fingerprints, mount a camera on the dashboard, or rifle through the vehicle's glove compartment to peruse the tips that other passengers have paid. "[T]here is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees." *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319,

6

329 (1979). The Supreme Court explored a related issue in *Jardines*, where law enforcement officers invited a narcotics-detecting canine to sniff around a suspect's front porch. The Court held that a Fourth Amendment search occurred because the detectives had gathered information by "physically entering and occupying" the constitutionally protected curtilage of the house, in order "to engage in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, 133 S. Ct. at 1414. The dog's investigation amounted to an "unlicensed physical intrusion," despite the fact that custom extended an implicit license "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 1415. "The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose." *Id.* at 1416. The detectives' conduct was therefore a search under the Fourth Amendment because they engaged in behavior that objectively exceeded the scope of their implicit license to enter while occupying a constitutionally protected area. *Id.* at 1416-17. Here as well, the implied license all taxis extend to the public does not encompass an invitation to install surveillance technology in their vehicles.

***

Accordingly, I join the majority's analysis of *Jones*, *Knotts*, and *Karo*. Because I do not believe that Defendants properly put at issue El-Nahal's interest in the taxi at the time of the trespass, and because I disagree with the district court's analysis of the physical trespass-based Fourth Amendment claim, I would vacate and remand for further factual development. I therefore concur in part and respectfully dissent in part.

7